IN THE
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
Lynchburg Division

_____

Civil Action No. 6:12CV00065
Bankruptcy Court Docket Number: 12-06017

_____

ROBERT M. JOHNSON,

Appellant,

v.

JOHN THOMAS DOWLING,

Appellee.

_____

BRIEF OF APPELLANT

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRIGINIA

James Frederick Watson, Esquire
VSB No. 40322
Pavlina B. Dirom, Esquire
VSB No. 66573
CASKIE & FROST, P.C.
2306 Atherholt Road
P. O. Box 6320
Lynchburg, Virginia 24505
(434) 846-2731 (telephone)
(434) 845-1191 (facsimile)
fwatson@caskiefrost.com
*Counsel for Appellant*

# TABLE OF CONTENTS

Table of Contents ................................................................................. 2

Table of Authorities ............................................................................ 3

Basis of Appellate Jurisdiction ........................................................ 5

Issues Presented for Review............................................................... 6

Standard of Appellate Review........................................................... 6

Statement of the Case ......................................................................... 7

Statement of Facts............................................................................... 8

Summary of the Argument.................................................................. 12

Argument ............................................................................................ 14

    I.  The Bankruptcy Court Erroneously Interpreted And Applied
        The Law By Requiring Proof That Dowling Intended To
        Default At The Time He Signed The Note. .................................... 15

    II.  The Bankruptcy Court Committed Clear Error In Its Factual
        Finding That It Could Not Be Concluded That Loan Funds Were
        Used To Pay The H&B Debt And For Other Purposes.............................. 21

    III. The Bankruptcy Court Committed Clear Error In Its Factual Finding
        That, After Dowling's Default, The Parties Agreed To A Repayment
        Schedule. ..................................................................................... 26

    IV. Under An Application Of The Correct Law To The Actual Facts Of
        This Case, Dowling's Debt To Johnson Is Nondischargeable Under
        11 U.S.C. 523(a)(2)(A). .............................................................. 29

Conclusion. ......................................................................................... 36

Request for Oral Argument. ............................................................... 37

Certificate of Service............................................................................38

<u>TABLE OF AUTHORITIES</u>

**CASES**

<u>Cass v. Jones (In re Jones)</u>,
    50 B.R. 911 (Bankr. N.D. Tex 1985)........................................................18

<u>Citibank v. Eashai (In re Eashai)</u>,
    87 F.3d 1082 (9th Cir. 1996)...............................................................17

<u>Fensick v. Segala (In re Segala)</u>,
    133 B.R. 261 (Bankr. D. Mass. 1991)..........................................18, 19, 31

<u>Foley & Lardner v. Biondo (In re Biondo)</u>,
    180 F.3d 126 (4th Cir. 1999)..............................................................15, 29

<u>Hecht's v. Valdes (In re Valdes)</u>,
    188 B.R. 533 (Bankr. D. Md. 1995)........................................................17

<u>House v. McKean (In re McKean)</u>,
    2012 Bankr. LEXIS 2176 (Bankr. N.D. Cal. 2012)...............................20-21

<u>In re Kimze</u>,
    761 F.2d 421(7th Cir. 1985)...............................................................16

<u>Kielisch v. Educ. Credit Mgmt Corp.(In re Kielisch)</u>,
    258 F.3d 315 (4th Cir. 2001)................................................................6

<u>Klein v. PepsiCo, Inc.</u>,
    845 F.2d 76 (4th Cir. 1988)..................................................................6

<u>Longo v. McLaren (In re McLaren)</u>,
    3 F.3d 958 (6th Cir. 1993).................................................................17

<u>Marineau v. Slonim</u>,
    1994 U.S. Dist. LEXIS 16600 (W.D. Va. 1994)..........................18-19, 31, 32

<u>Merchants Nat'l Bank & Trust v. Pappas (In re Pappas)</u>,
    661 F.2d 82 (7th Cir. 1981)...............................................................18, 31

<u>Rembert v. AT&T Universal Card Servs. (In re Rembert)</u>,
    141 F3d 277 (6th Cir. 1998)...............................................................17

<u>Terry v. Meredith (In re Meredith)</u>,
    527 F3d 372 (4th Cir. 2008)................................................................6

**STATUTES**

11 U.S.C. § 523(a)(2)(A)...................................................................…...............*passim*

28 U.S.C. § 158(a)(1) .................................................................................... 5

**OTHER AUTHORITIES**

Bankruptcy Rule 8002...................................................................................5

Bankruptcy Rule 8010...................................................................................5

Bankruptcy Rule 8013...................................................................................6

# BRIEF OF APPELLANT

**To the Honorable U.S. District Court Judge:**

Pursuant to Bankruptcy Rule 8010, the Appellant, Robert M. Johnson, ("Johnson"), plaintiff in the bankruptcy court, hereby files this Brief of Appellant for his appeal from the Judgment and Memorandum of the U.S. Bankruptcy Court, dated September 27, 2012.

Exhibits to which reference is herein made shall be referred to by number as in the trial court, e.g. (Pl's Exh. ___). References to trial testimony shall be referenced by the appropriate page or pages of the July 26, 2012 trial transcript, e.g. (Tr. ___). References to the bankruptcy court's September 27, 2012 Memorandum opinion shall be referenced by the appropriate page or pages of the memorandum, e.g. (Memorandum Op. at ___).

## BASIS OF APPELLATE JURISDICTION

The District Court shall have jurisdiction to hear appeals from final judgments, orders and decrees of the bankruptcy court. 28 USC § 158(a)(1). In this case, Johnson's appeals from the September 27, 2012 final Judgment of the United States Bankruptcy Court for the Western District of Virginia, Lynchburg Division. Johnson timely filed his Notice of Appeal on October 4, 2012, within 15 days allowed under Bankruptcy Rule 8002 (a).

## ISSUES PRESENTED FOR REVIEW

Did the bankruptcy court err in granting judgment in the adversary proceeding in favor of Defendant, John Thomas Dowling ("Dowling") and in holding that the debt owed by the Defendant to the Plaintiff was dischargeable in bankruptcy?

I.    Did the bankruptcy court apply the correct legal standard in determining whether or not the debt is nondischargeable under 11 USC § 523(a)(2)(A)? Specifically, did the bankruptcy court err in requiring, as an element of fraud, proof that the debtor intended to breach the contract at the time the contract was made and that the debtor intended not to pay?

II.   Did the bankruptcy court err in its finding of fact that it could not necessarily be concluded that the funds used to pay H&B and expenses of the business were taken from the loan funds?

III.  Did the bankruptcy court err in its finding of fact that the parties entered into a subsequent agreement regarding repayment of debt?

IV.   Upon an application of the correct law to the actual facts of this case, is Dowling's debt to Johnson nondischargeable under 11 U.S.C. § 523(a)(2)(A)?

## STANDARD OF APPELLATE REVIEW

In reviewing a decision of a bankruptcy court, the district court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo.* Terry v. Meredith (In re Meredith), 527 F.3d 372, 375 (4th Cir. 2008); Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch), 258 F.3d 315, 319 (4th Cir. 2001); see Fed. R. Bankr. 8013.

A finding of fact is clearly erroneous if, after review of the record, the reviewing court is left with a firm and definite conviction that an error has been committed. See Klein v. PepsiCo, Inc., 845 F.2d 76, 79 (4th Cir. 1988).

## STATEMENT OF THE CASE

On January 6, 2012, John Thomas Dowling ("Dowling") filed a Chapter 7 bankruptcy petition with the United States Bankruptcy Court for the Western District of Virginia. Johnson, one of Dowling's creditors, filed an adversary complaint on February 24, 2012 seeking to have a debt from Dowling to Johnson in the amount of $175,987.50, plus interest and costs, declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (4) & (6).

This matter was tried before bankruptcy court, with the Honorable William E. Anderson presiding, on July 26, 2012. The bankruptcy court entered judgment for Dowling on September 27, 2012, and held that the debt owed by Dowling to Johnson was dischargeable.

In its Memorandum opinion, the bankruptcy court held, among other things, that as a matter of law Johnson's claim under § 523(a)(2)(A) required proof that Dowling intended, at the time the parties executed the Deed of Trust Note that evidenced Dowling's debt, to default on his payment obligation under that Note (Memorandum Op. at 13-14).

The court's Memorandum included a factual finding that "[m]oney . . . is fungible and therefore it cannot necessarily be concluded that the funds used to pay H&B and expenses of the business were taken from the Loan Funds" (Memorandum Op. at 15).

The court's Memorandum also included a factual finding that "[w]hen the Alpha Omega loan failed to materialize and the Debtor failed to repay the Loan Funds timely, the parties agreed to a repayment schedule under which the Debtor,

or Dowling Enterprises, would pay the Plaintiff $15,000.00 on April 2, 2008, and $2,250.00 per month thereafter" (Memorandum Op. at 16-17). With regard to the finding that the parties entered into a subsequent repayment agreement, the bankruptcy court stated:

> The court finds it telling that the Debtor offered to pay the debt over time, that the Plaintiff freely accepted the offer, and that the Debtor made substantial payments pursuant to the resulting agreement. These are not the acts of a debtor who was intent on fraud nor are they the acts of a creditor who believed that he had been defrauded.

(Memorandum Op. at 17).

Because it concluded that Johnson did not meet the burden of proving that Dowling intended, at the time the parties executed the Deed of Trust Note, to default on his payment obligation under the Note, the bankruptcy court did not consider the other elements of fraud (Memorandum Op. at 17).

On October 4, 2012, Johnson noted his appeal from the bankruptcy court's September 27, 2012 Judgment.

## STATEMENT OF FACTS

In early 2008, Dowling approached Johnson and asked him to make a loan to Dowling Enterprises, LLC ("Dowling Enterprises") in the amount of $150,000.00 (Tr. 10, 32-33). At that time, Dowling was the manager of Dowling Enterprises (Tr. 31), which was a real estate development company (Tr. 32), and he and his wife owned 66.239% of Dowling Enterprises' membership interests. (Tr. 39-41; Pl's Exh. 5). Dowling Enterprises owned real estate in Chesterfield County, Virginia on which a car wash was operated by Chesterfield Car Wash Company, LLC ("Chesterfield

Car Wash") (Tr. 31). Chesterfield Car Wash leased the property from Dowling Enterprises (Tr. 31-32). Dowling was a member of Chesterfield Car Wash (Tr. 32).

In requesting the loan, Dowling made several representations to Johnson. First, he represented to Johnson that the loan proceeds would be used to make a down payment on a certain parcel of real estate that Dowling Enterprises wished to purchase for the construction of a second car wash (Tr. 10, 33, 53). He also represented to Johnson that Dowling Enterprises would be able to repay the loan within 60-days because it had secured a refinance of another property in an amount sufficient to pay Johnson, and that the loan had been approved (Tr. 11, 34)

Relying on the representations of Dowling, on February 1, 2008, Johnson made a loan to Dowling Enterprises in the amount of $150,000.00 (Tr. 11, 47; Pl's Exh. 1). Dowling personally guaranteed the loan (Tr. 11, Pl's Exh. 1). The loan and Dowling's guaranty were evidenced by a Deed of Trust Note dated February 1, 2008 ("Note"), which was executed by Dowling, individually and as manager of Dowling Enterprises (Tr. 11-12; Pl's Exh. 1). The Note was secured by a second deed of trust on certain real estate owned by Dowling Enterprises. But for the representations made by Dowling, Johnson would not have made the loan to Dowling Enterprises (Tr. 12-13).

Contrary to Dowling's representation to Johnson as to the intended use of the loan proceeds, none of the loan proceeds were used for a down payment or deposit on real estate or for the acquisition of any real estate (Tr. 17-18, 49-50, 53-54). In fact, of the $150,000.00 loaned to Dowling Enterprises by Johnson, $50,000.00 was diverted away from Dowling Enterprises for the personal enrichment of Dowling,

individually (Tr. 49-50), and approximately $64,000.00 was diverted to Chesterfield Carwash for its operating expenses (Tr. 51).

On the same day that Dowling executed the Note, he immediately used $21,500.00 of the $150,000.00 loan proceeds to pay down Dowling Enterprises' preexisting debt to another lender, H&B Associates, Inc. ("H&B") (Tr. 42-44, 50). Shortly thereafter, Dowling diverted $50,000.00 of the loan proceeds for his own personal benefit. Specifically, he used $50,000.00 to purchase the membership interests of another member of Dowling Enterprises, Bruce Griggs, thereby increasing his personal equity interest in the company (Tr. 49-50). Also, approximately $15,000.00 was used to pay Dowling Enterprises preexisting debt to American Express (Tr. 50-51). The balance of the $150,000.00 loan proceeds – approximately $64,000.00 – was diverted to Chesterfield Carwash for "operational purposes" (Tr. 51).

Three weeks after executing the Note, Dowling prepared a Balance Sheet for Dowling Enterprises (Tr. 47-49; Pl's Exh. 7). The $150,000 Dowling Enterprises had received from Johnson was not included on the Balance Sheet (Tr. 48; Pl's Exh. 7). In addition, Dowling Enterprises' $150,000.00 obligation to Johnson was not included on the Balance Sheet (Tr. 48-49; Pl's Exh. 7).

Dowling never informed Johnson that (1) one-third of the loan funds would be used to enrich himself rather than for the benefit of Dowling Enterprises; (2) that nearly one-fourth of the loan funds would be used to pay preexisting debts of Dowling Enterprises; (3) that approximately forty-three percent of the loan funds would be used for the operational expenses of Chesterfield Car Wash; and (4) that

zero percent of the loan funds would be used for Dowling Enterprises' acquisition of real estate (Tr. 13, 54). If Johnson knew how Dowling actually intended to use the loan funds, he would not have made the loan (Tr. 13).

In addition to representing how the loan funds would be used, Dowling also made a representation to Johnson as to the source of funds to be used to repay the loan obligation. Specifically, Dowling represented to Johnson that Dowling Enterprises would be able to pay the loan back, with interest, within sixty days because a lender, Alpha Omega Financial Corp. ("Alpha Omega"), had agreed to refinance a certain loan, which would result in a cash infusion to Dowling Enterprises in an amount that would permit repayment of Johnson's loan (Tr. 34-35). Dowling represented to Johnson that the Alpha Omega loan had been approved and that the documents had been signed (Tr. 34). Despite these representations, three days prior to receiving the loan funds from Johnson and executing the Note, Dowling was aware that he had no agreement with Alpha Omega as to a loan amount and that no loan had been approved in an amount sufficient to repay Johnson (Tr. 46). Dowling did not disclose this fact to Johnson, and yet he proceeded to borrow the funds from Johnson (Tr. 46). Johnson continued to believe that Dowling Enterprises had secured financing that would allow it pay off the loan within sixty days.

There was no evidence that Dowling Enterprises and Alpha Omega ever agreed to a loan amount, an essential element of any loan agreement. In fact, despite Dowling's representations that a loan had been secured, Dowling Enterprises never received any loan funds from Alpha Omega (Tr. 45-47).

According to the terms of the Note, Dowling Enterprises was to pay Johnson the full amount of the Note, with interest, by April 2, 2008 (Tr. 14; Pl's Exh. 1). As of April 2, 2008, Johnson was paid nothing (Tr. 14). The Note further provided that if the debt was unpaid as of April 2, 2008, Dowling Enterprises was to pay $15,000.00, and interest would accrue at an annual rate of 18% and be payable monthly, with principal and interest payable on demand. (Pl's Exh. 1). Between May 1, 2008 and January 2, 2009, Dowling Enterprises sporadically paid Johnson a total sum of $28,950.00 (Tr. 14 -15; Pl's Exh. 2). Dowling never paid anything as guarantor (Tr. 15). Johnson did not foreclose on the real estate that secured the Note because he could not afford to pay the debt of the holder of the first deed of trust on the same property (Tr. 29). The real estate was ultimately sold for an amount that was insufficient to pay, in full, the holder of the first deed of trust (Tr. 58). As a consequence, Johnson received nothing from the sale of this property.

Ultimately, because of their failure to pay, Johnson obtained a judgment from the Virginia Beach Circuit Court against Dowling Enterprises and Dowling, individually, in the amount of $175,987.50, plus interest at 18% per annum, plus costs in the amount of $228.00 (Tr. 15-17; Pl's Exh. 3). Johnson has been paid nothing as a result of this judgment (Tr. 17), and Dowling now seeks the discharge of this debt.

## SUMMARY OF THE ARGUMENT

The bankruptcy court erred in granting judgment in the adversary proceeding in favor of Dowling and in holding that the debt owed by Dowling to Johnson was dischargeable in bankruptcy.

The bankruptcy court specifically erred in its interpretation and application of law by requiring, as an element of fraud, proof that Dowling intended to breach his contract with Johnson at the time the contract was made. Misrepresentations as to either or both (1) the intended use of borrowed funds or (2) the source of funds to be used to satisfy an obligation constitute fraud under § 523(a)(2)(A).

Moreover, the bankruptcy court committed clear error in its factual finding that "[m]oney . . . is fungible and therefore it cannot necessarily be concluded that the funds used to pay H&B and expenses of the business were taken from the Loan Funds" (Memorandum Op. at 15). This finding is contrary to the record. Indeed, Dowling specifically and clearly testified that he used $21,500.00 of the Johnson loan proceeds to pay Dowling Enterprises' debt to H&B (Tr. 42-44); that he used $50,000.00 of the Johnson loan proceeds to purchase, for himself, another member's membership interest in Dowling Enterprises (Tr. 49); that he used the Johnson loan proceeds "for business purposes for what was necessary at the time" (Tr. 50); that he used approximately $15,000.00 to pay an American Express bill (Tr. 50-51); and that he used approximately $64,000.00 for "operational purposes" of "the car wash" (Tr. 51). Because Dowling readily conceded as to the specific uses made of the Johnson loan proceeds, the bankruptcy court's factual finding to the contrary was a clear error.

The bankruptcy court also committed a clear error in its factual finding that "[w]hen the Alpha Omega loan failed to materialize and the Debtor failed to repay the Loan Funds timely, the parties agreed to a repayment schedule under which the Debtor, or Dowling Enterprises, would pay the Plaintiff $15,000.00 on April 2, 2008,

and $2,250.00 per month thereafter" (Memorandum Op. at 16-17). There is nothing in the record to support this finding. In fact, Dowling and Johnson never entered into a repayment schedule or any other agreement besides the original Note. All payments were made pursuant to the terms of the Note. The "schedule" referenced by the bankruptcy court was simply a record made by Johnson of the payments he received (Tr. 14-15; Pl's Exh. 2). It was not an agreed upon repayment schedule, and it does not reflect the actions of Johnson after he learned that he had been defrauded.

Finally, under an application of the correct law to the actual facts of the case, Dowling's debt to Johnson was clearly nondischargeable under 11 U.S.C. § 523(a)(2)(A) because it was a debt obtained by false pretense, false representations, or actual fraud.

## ARGUMENT

In granting judgment in the adversary proceeding in favor of Dowling, and in holding that the debt owed by Dowling to Johnson was dischargeable in bankruptcy, the bankruptcy court erroneously interpreted and applied the law and committed clear error in its findings of fact. Under an application of the correct law to the actual facts of the case, Dowling's debt to Johnson was clearly nondischargeable under 11 U.S.C. § 523(a)(2)(A).[1]

---

[1] 11 U.S.C. 523(a)(2)(A) provides in pertinent part:
(a) A discharge under section 727 . . . of this title . . . does not discharge an individual debtor from any debt --
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by--
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

I.      **The Bankruptcy Court Erred In Its Interpretation And Application Of Law By Requiring, As An Element Of Fraud, Proof That Dowling Intended To Breach His Contract With Johnson At The Time The Contract Was Made.**

In stating its interpretation of the law on which its judgment was based, the Bankruptcy Court explained:

> The important point here is that a plaintiff must prove that the debtor intended to breach the contract at the time the contract is made. **In this instance, in order to prevail, the Plaintiff must prove that the Debtor intended, at the time the parties executed the Deed of Trust Note, to default on his payment obligation under that note.**

(Memorandum Op. at 13-14) (emphasis added). This is an incorrect statement of the law. In imposing this incorrect burden on Johnson, the bankruptcy court erroneously interpreted and applied the law.

In a complaint brought pursuant to 11 U.S.C. § 523(a)(2)(A), fraud requires proof of the following elements by a preponderance of the evidence: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation. Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 134 (4th Cir. 1999). It is against this standard that the bankruptcy court should have addressed Johnson's arguments and proof.

Johnson's proof that Dowling incurred his debt through fraud centered on two representations made by Dowling. First, it is undisputed that (1) Dowling represented to Johnson that the loan funds would be used by Dowling Enterprises, LLC for a down payment on a certain parcel of real estate on which Dowling Enterprises intended to construct a new carwash facility (Tr. 10, 33, 53), and (2) the

loan proceeds were not used for that purpose (Tr. 17-18, 49-50, 53-54). Second, it is undisputed that (1) Dowling represented that he had been approved for a loan in an amount sufficient to repay Johnson within sixty days (Tr. 11, 34), and (2) that no such loan was ever secured (Tr. 45-47). Johnson presented clear and compelling evidence that both of these representations by Dowling were false, that Johnson reasonably relied on them in deciding to make the loan, that he was induced to make the loan by these false representations, and that he suffered harm as a result of the fraud perpetrated by Dowling. However, under the bankruptcy court's incorrect analysis, neither of these fraudulent representations would be sufficient to support a finding of nondischargeability under 11 U.S.C. § 523(a)(2)(A).

In its Memorandum opinion, the bankruptcy court cites In re Kimzey, 761 F. 2d 421 (7th Cir. 1985). In that case, the court set out the elements that a plaintiff must show in order to succeed on a claim that a debt is non-dischargeable on the basis of false representations. The creditor must prove that the debtor obtained the money through representations which the debtor knew or should have known to be false or that he made with reckless disregard for the truth as to constitute willful misrepresentation, he must also prove intent to deceive and reliance on those representations. Id.

The bankruptcy court, however, failed to analyze the case under this or similar framework. Instead, the bankruptcy court applied a legal standard taken from credit card cases. The bankruptcy court, following the credit card cases, held that Johnson had to prove that Dowling did not intend to pay at the time he signed the Note. The credit card cases cited by the bankruptcy court are, however,

distinguishable and not applicable under the facts of this case. In credit card cases, the courts engage in different analysis given the different nature of credit card transaction. In credit card cases, it is said that the use of credit card represents an actual or implied intent to repay the debt incurred and that the representation made by the debtor in these transactions is that "he has intention to repay." See e.g. Rembert v. AT&T Universal Card Servs. (In re Rembert), 141 F.3d 277 (6th Cir. 1998)(credit card case); Citibank v. Eashai (In re: Eashai), 87 F.3d 1082 (9th Cir. 1996) (credit card case); Hecht's v. Valdes (In re Valdes), 188 B.R. 533 (Bankr. D. Md. 1995)(credit card case). In this case, however, Johnson is not relying on any implied or express representation of intention to repay in order to obtain the relief sought. Instead, he relied on Dowling's clear and express representations as to how the borrowed funds would be used and as to the source of the funds that would be used to repay the loan. Reliance on the credit card line of cases was therefore misplaced.

While proof that a debtor intended to breach the contract at the time of the contract certainly constitutes fraud under § 523(a)(2)(A), it is not a required element of fraud. Indeed, Dowling's misrepresentations to Johnson as to the use of funds and as to the source of funds for repayment also constituted fraud.

A.   *A Misrepresentation As To The Intended Use Of Loan Funds Constitutes Fraud Under § 523(a)(2)(A).*

A misrepresentation as to the intended use of funds constitutes fraud under § 523(a)(2)(A). See Longo v. McLaren (In re McLaren), 3 F.3d 958 (6th Cir. 1993) (debtor misrepresented that payment would be devoted to acquisition of commercial

17

real estate); <u>Merchants Nat'l Bank & Trust v. Pappas (In re Pappas)</u>, 661 F.2d 82 (7th Cir. 1981)(debtor misrepresented that loans were needed to purchase and develop certain real estate, but the loan proceeds were never used for that purpose); <u>Marineau v. Slonim</u>, 1994 U.S. Dist. LEXIS 16600 (W.D. Va. 1994)(debtor misrepresented that loan proceeds were to be used for the construction of homes that had already been sold); <u>Fensick v. Segala (In re Segala)</u>, 133 B.R. 261, 264 (Bankr. D. Mass. 1991) (funds loaned for construction work not so used and debt declared nondischargeable); <u>Cass v. Jones (In re Jones)</u>, 50 B.R. 911 (Bankr. N.D. Tex. 1985) (funds loaned to purchase oil rig not so used and debt declared nondischargeable).

In <u>In re Pappas</u>, the debtor borrowed a total of $60,500.00 from a bank. 661 F.2d at 84. The debtor represented to the bank that the loan proceeds would be used to purchase and develop two parcels of real estate. <u>Id.</u> The debtor never purchased or otherwise acquired any interest in the real estate, and he never advised the bank that he was using the funds for other purposes. <u>Id.</u> The bankruptcy court held that the loan to the debtor was induced by false pretense or false representations and was a non-dischargeable debt. <u>Id.</u> at 83. The bankruptcy court's holding was affirmed by the district court and the court of appeals. <u>Id.</u> In affirming the district court, the court of appeals stated:

> After reviewing all the evidence presented, this Court finds ample evidence to support the trial court's findings. [Debtor] on numerous occasions represented the loans were needed to purchase and develop Lots Numbers 6 and 7. As [Debtor] never purchased or developed these lots, his intention to deceive [the bank] seems apparent.

<u>Id.</u> at 86.

In <u>Marineau</u>, the debtor borrowed $90,000.00 from an individual creditor. 1994 U.S. District LEXIS 16600 at 2-3. The debtor falsely represented that the funds would be used for the construction of homes that already had been sold. <u>Id.</u> at 8. The bankruptcy court held that the debt was nondischageable under 11 U.S.C. § 523(a)(2)(A). <u>Id.</u> at 1. In affirming the bankruptcy court, the district court explained that "[w]hen money is entrusted to a debtor for a specific purpose, the debtor impliedly represents that it will be used for that purpose, and failure to use the funds for that specific purpose constitutes a misrepresentation of the debtor's intention." <u>Id.</u> at 7.

In <u>In re Segala</u>, the debtor agreed to perform construction work on the creditor's house, and the creditor advanced funds to the debtor to be used in performance of the contract. 133 B.R. at 262-63. The court held that the debtor's subsequent failure to use the money in performing the contract constituted a misrepresentation of his implied intention to use it for that purpose. <u>Id.</u> at 264.

In this case, under the bankruptcy court's erroneous statement of the law, none of the misrepresentations discussed in the foregoing cases would have been sufficient to constitute fraud under § 523(a)(2)(A). Indeed, under the bankruptcy court's requirement of proof of intent to breach the contract at the time the contract was made, as long as the debtors subjectively intended to pay the money back, their false representations and ultimate use of the funds was of no consequence, even if the funds had been used to pay gambling debts, to purchase lottery tickets, or for any other legal or illegal purpose. The representations and use of the funds in those

cases would be irrelevant under the bankruptcy court's incorrect interpretation and application of the law.

B.     *A Misrepresentation As To The Source Of Funds For Repayment Of A Debt Constitutes Fraud Under § 523(a)(2)(A).*

In addition to making a false representation to Johnson as to how Dowling Enterprises intended to use the borrowed funds, Dowling also misrepresented that a loan had been approved that would permit Dowling Enterprises to repay Johnson within sixty days. (Tr. 11, 34). A misrepresentation as to the source of funds to be used for repayment of a debt constitutes fraud under § 523(a)(2)(A). See House v. McKean (In re McKean), 2012 Bankr. LEXIS 2176 (Bankr. N.D. Cal. 2012).

In In re McKean, the creditor advanced money to the debtor based upon the debtor's statement that he expected to soon receive commissions from real estate sales that had been or would be completed, and that these funds would be the source of repayment. Id. at 9-10. In finding the debt that arose from the misrepresentation nondischargeable under § 523(a)(2)(A), the court stated:

> The Court believes that the evidence demonstrated, and [Debtor] did not entirely dispute, that this advance was made based upon [Debtor's] statement that he expected shortly to receive commissions from real estate sales that had been or would soon be completed. The Court found this testimony credible because, by the time of this advance, and in view of [Debtor's] failure to make payments then due, as well as the understanding that the equity in the Real Property was in all likelihood at least substantially eroded, **the Court believed that it was highly unlikely that [Creditor] would have advanced any further funds without an express statement from [Debtor] respecting a specific source of repayment.** The Court is also convinced that [Debtor's] statement regarding the source of funds of repayment was false when made.

Id. (emphasis added).

In this case, as in <u>In re McKean</u>, Johnson would not have loaned any funds to Dowling Enterprises without Dowling's representation as to the specific source of funds for repayment (Tr. 13).

Based on the foregoing, the bankruptcy court erroneously required, as an element of fraud, proof that Dowling intended to breach his contract with Johnson at the time the contract was made. A misrepresentation as to the intended use of borrowed funds, and as to the source of funds to be used for repayment, clearly supports a finding of nondischargeability under § U.S.C. 523(a)(2)(A).

The bankruptcy court's erroneous interpretation and application of the law, especially when coupled with the following erroneous findings of fact, constitutes reversible error.

## II. The Bankruptcy Court Committed Clear Error In Its Factual Finding That "[M]oney . . . Is Fungible And Therefore It Cannot Necessarily Be Concluded That The Funds Used To Pay H&B And Expenses Of The Business Were Taken From The Loan Funds"

In support of his argument that Dowling misrepresented how the borrowed funds would be used, Johnson presented undisputed evidence – mostly through the testimony of Dowling - that Dowling used $21,500.00 of the Johnson loan proceeds to pay Dowling Enterprises' debt to H&B (Tr. 42-44); that he used $50,000.00 of the Johnson loan proceeds to purchase for himself another member's membership interest in Dowling Enterprises (Tr. 49); that he used the Johnson loan proceeds "for business purposes for what was necessary at the time" (Tr. 50); that he used approximately $15,000.00 to pay an American Express bill (Tr. 50-51); and that he used approximately $64,000.00 for "operational purposes" of "the car wash" (Tr. 51).

Despite this clear and undisputed evidence, the bankruptcy court made the factual finding that "[m]oney . . . is fungible and therefore it cannot necessarily be concluded that the funds used [by Dowling] to pay H&B and expenses of the business were taken from the Loan Funds" (Memorandum Op. at 15). The record contradicts this finding. Indeed, with regard to the H&B payment, Dowling testified as follows:

> [Counsel]:  And then [the draft loan closing statement, Pl's Exh. 6] lists various costs and pay-offs that would come out of the proceeds of [the Alpha Omega] loan, correct?
>
> [Dowling]:  Correct.
>
> [Counsel]:  And go about half way down, there is a pay off listed that is in handwriting that says H&B partial pay off, do you see that?
>
> [Dowling]:  Yes, sir.
>
> [Counsel]:  And that shows that the partial pay off to H&B would be twenty-one thousand five hundred dollars; is that right
>
> [Dowling]:  That is correct.
>
> [Counsel]:  Now, you ended up making a partial pay off to H&B; is that correct?
>
> [Dowling]:  Yes, sir.
>
> [Counsel]:  ***But you used Mr. Johnson's money to do it, didn't you***?
>
> [Dowling]:  ***Yes, I did.***
>
> [Counsel]:  You owed H&B about twice that amount, didn't you?
>
> [Dowling]:  Yes, sir.
>
> [Counsel]:  In fact, you used Mr. Johnson's money to make that pay

off to H&B on the same date that you signed the note to Mr. Johnson; isn't that right?

[Dowling]:    I believe, as I recall, Mr. Johnson wired the money to my attorney's account prior to the note. Again, it was five years ago, I don't recall and a lot of this was done on a hand shake but H&B was a second deed of trust holder.

[Counsel]:    But the question is, you paid that pay off to H&B on February 1st, 2008, correct?

[Dowling]:    I did so they would vacate their second position.

[Counsel]:    And as a result of that pay off, the balance was reduced to twenty-one thousand five hundred dollars that you owed H&B; is that right?

[Dowling]:    Yes. And they vacated their position on the deed of trust.

[Counsel]:    You owed H&B about twice that amount, didn't you?

[Dowling]:    Yes, sir.

. . . .

[Counsel]:    Mr. Dowling, you have in front of you Plaintiff's Exhibit nine. Do you recognize that document?

[Dowling]:    Yes, sir, I do.

[Counsel]:    And that's a promissory note dated February 1st, 2008 to H&B associates?

[Dowling]:    Yes, sir.

[Counsel]:    And this promissory note was to take into account the balance owed to H&B as of February 2008 after you had made a significant payment, correct?

[Dowling]:    Yes, sir.

[Counsel]:    ***A payment using the money you had borrowed from Mr. Johnson?***

[Dowling]:    ***Yes, sir.***

23

(Tr. 42-44) (emphasis added).

With regard to the other "expenses of the business", Dowling testified as follows:

[Counsel]: Shortly after receiving money from Mr. Johnson, you used individually personally about fifty thousand dollars of that money to acquire the ownership interest of another owner of Dowling Enterprises, didn't you?

[Dowling]: Yeah. I had an investor who ran into a financial pinch on his own and needed some money back returned, yes.

[Counsel]: And his name was Bruce Griggs; is that right?

[Dowling]: That is correct, yes.

[Counsel]: And Mr. Griggs – Mr. Griggs received fifty thousand dollars from you *and that fifty thousand dollars came from the money you borrowed from Mr. Johnson, correct?*

[Dowling]: *That is correct.*

[Counsel]: And you did not use any of Mr. Johnson's money to make a down payment on any real estate, did you?

[Dowling]: As I recall, there were some issues with the property where we decided that it was not a feasible location.

[Counsel]: Okay. And you didn't – after you made that determination, you didn't turn around and give Mr. Johnson his money back, did you?

[Dowling]: No. I still believed that the refinancing from Alpha Omega was still in process and it was going to happen.

[Counsel]: *But you went ahead and spent Mr. Johnson's money, correct?*

[Dowling]: *I used it for business purposes for what was necessary at the time.*

[Counsel]:    You used twenty-one thousand five hundred dollars to pay the H&B debt, correct?

[Dowling]:    I did.

[Counsel]:    You used fifty thousand dollars for you to personally incur ownership interest from Dr. Griggs, correct?

[Dowling]:    I mean, yes, I gave him some of his money back. He needed it for his children's college.

[Counsel]:    As a result of you giving him some of his money back, he gave you some of his membership?

[Dowling]:    Yes. We exchanged it back, yes, sir.

[Counsel]:    And you used approximately fifteen thousand dollars to pay off an American Express bill?

[Dowling]:    Yes.

[Counsel]:    Okay. That leaves sixty-four thousand dollars and you don't know where that sixty-four thousand dollars went, do you?

[Dowling]:    It was used for operational purposes I would guess. I don't have bank statements at the time.

[Counsel]:    Operational purposes of the car wash?

[Dowling]:    Yes.

(Tr. 49-51) (emphasis added).

Because Dowling's specific accounts of his use of the Johnson loan proceeds, the bankruptcy court's factual finding was a clear error.

**III.   The Bankruptcy Court Clearly Erred In Its Factual Finding That "[W]hen The Alpha Omega Loan Failed To Materialize And The Debtor Failed To Repay The Loan Funds Timely, The Parties Agreed To A Repayment Schedule Under Which The Debtor, Or Dowling Enterprises, Would Pay The Plaintiff $15,000.00 On April 2, 2008, And $2,250.00 Per Month Thereafter"**

As discussed in Section I, the bankruptcy court erroneously imposed on Johnson the burden of proving that Dowling intended, at the time the parties executed the Deed of Trust Note, to default on his payment obligation under the Note. See supra Section I. The court ultimately found that there was "strong countervailing evidence that the Debtor intended to repay the debt." (Memorandum Op. at 16). The court explained:

> When the Alpha Omega loan failed to materialize and the Debtor failed to repay the Loan Funds timely, the parties agreed to a repayment schedule under which the Debtor, or Dowling Enterprises, would pay the Plaintiff $15,000.00 on April 2, 2008, and $2,250.00 per month thereafter . . . . The court finds it telling that the Debtor offered to pay the debt over time, that the Plaintiff freely accepted the offer, and that the Debtor made substantial payments pursuant to the resulting agreement. These are not the acts of a debtor who was intent on fraud nor are they the acts of a creditor who believed that he had been defrauded.

(Memorandum Op. at 16-17).

In support of this factual finding, the court relied on Plaintiff's Exhibit 2 (Memorandum Op. at 17 n.25). The bankruptcy court completely misunderstood this Exhibit. Indeed, Plaintiff's Exhibit 2 was nothing more than a record made by Johnson of the payments he received pursuant to the terms of the original Note. (Tr. 14-15; Pl's Exh. 2). The only testimony as to Plaintiff's Exhibit 2 was by Johnson, which is as follows:

[Counsel]:    Now, according to the terms of the note that's Exhibit one,

26

you were to be paid in full with interest by April 2nd, 2008; is that correct?

[Johnson]:   Yes, sir.

[Counsel]:   As of April 2nd, 2008, were you paid in full?

[Johnson]:   No, sir.

[Counsel]:   Did you ever receive any payments from Dowling Enterprises?

[Johnson]:   Yes, I did.

[Counsel]:   Did you make a record of these payments?
[Johnson]:   Yes, I did.

. . . .

[Counsel]:   Mr. Johnson, I've put in front of you a document that's been marked Exhibit two that's been admitted into evidence. Do you recognize that document?

[Johnson]:   I do.

[Counsel]:   What is it?

[Johnson]:   It's a spreadsheet I did to follow along the payments, the due dates, the date paid, well, what the balance was after the payment.

[Counsel]:   And does Exhibit two accurately reflect the amount of payments you received from Dowling Enterprises?

[Johnson]:   Yes, it does.

[Counsel]:   And does it accurately reflect the dates of those payments?

[Johnson]:   Yes, it does.

(Tr. 14-15).

From the above testimony, and from Plaintiff's Exhibit 2, the bankruptcy court erroneously concluded that a simple record kept by Johnson was, in fact, the memorialization of an agreement entered into by the parties subsequent to April 2, 2008. A review of the document shows that this could not be the case. First, the document is dated "2-Feb-08", one day after the original Note was executed, and two months before payment under the Note came due (Pl's Exh. 2). Second, the payment schedule contained within the document is simply the payment schedule provided for by the original Note (Pl's Exh. 1).

In addition, it was never asserted or argued by either Dowling or Johnson that the parties ever entered into any such subsequent repayment agreement. On the contrary, as the following colloquy between Dowling's counsel and Johnson illustrates:

> [Counsel]:   Is [Pl's Exh. 1] the deed of trust note --
>
> [Johnson]:   Yes, it is.
>
> [Counsel]:   -- that you entered into?
>
> [Johnson]:   Right. Yeah, this was done to keep the transaction at arm's length.
>
> [Counsel]:   Okay. As far as you know, is that the only written documentation of the –
>
> [Johnson]:   Yes, ma'am.
>
> [Counsel]:   -- loan?

(Tr. 20-21)

Contrary to the bankruptcy court's finding, there was absolutely no agreement entered into by the parties after Dowling failed to repay Johnson in a

timely manner. Plaintiff's Exhibit 2 in no way reflects the acts of Johnson after he discovered he had been defrauded.

The bankruptcy court clearly gave this erroneous finding great weight and relied upon it in finding that the debt was not nondischargeable (Memorandum Op. at 17).

**IV.    Under An Application Of The Correct Law To The Actual Facts Of The Case, Dowling's Debt To Johnson Was Nondischargeable Under 11 U.S.C. § 523(A)(2)(A) Because It Was A Debt Obtained By Fraud.**

Under an application of the correct law to the actual facts of this case, Johnson should have prevailed, and Dowling's debt to Johnson should have been found to be nondischargeable. Indeed, while requiring a much higher burden of proof than the law requires, and while relying upon erroneous findings of fact, the Bankruptcy Court nevertheless noted that "This is a close case" (Memorandum Op. at 17).

In a complaint brought pursuant to 11 U.S.C. § 523(a)(2)(A), fraud requires proof of the following elements by a preponderance of the evidence: (1) a fraudulent misrepresentation; (2) that induces another to act or refrain from acting; (3) causing harm to the plaintiff; and (4) the plaintiff's justifiable reliance on the misrepresentation. In re Biondo, 180 F.3d at 134. The record in this case clearly supports a finding that Dowling's debt to Johnson is nondischargeable under 11 U.S.C. § 523(a)(2)(A) because it was obtained by false pretense, false representation, or fraud.

A.      *Dowling Made Fraudulent Misrepresentations To Johnson As To The Use Of The Funds And The Source Of Funds For repayment.*

Dowling misrepresented to Johnson at least two material facts, one as to the intended use of the borrowed funds and one as to the specific source of the funds to be used for repayment of the loan.

### (i) Use of Funds

A misrepresentation as to the intended use of funds constitutes fraud under § 523(a)(2)(A). See supra Section I(A).

It is undisputed that Dowling represented to Johnson that the borrowed funds would be used for a down payment by Dowling Enterprises on a parcel of real estate (Tr. 33). He told Johnson that he had visions of building other car washes, that he had a site located for the second carwash, and that he needed the funds for a down payment on that property to tie the property in (Tr. 10).

It is undisputed that Dowling Enterprises used none of the borrowed funds for a down payment on a parcel of real estate (Tr. 17-18, 49-51).

It is further undisputed that all of the borrowed funds were used for purposes unrelated to the acquisition of real estate, and that the depletion of those funds for those unrelated purposes began immediately. Indeed, on the same day that Dowling executed the Note, he immediately used $21,500.00 of the $150,000.00 loan proceeds to pay down Dowling Enterprises' preexisting debt to another lender, H&B (Tr. 42-44, 50). Shortly thereafter, Dowling diverted $50,000.00 of the loan proceeds for his own personal benefit. Specifically, he used $50,000.00 to purchase the membership interests of another member of Dowling Enterprises, Bruce Griggs,

thereby increasing his personal equity interest in the company (Tr. 49-50). Also, approximately $15,000.00 was used to pay Dowling Enterprises preexisting debt to American Express (Tr. 50-51). The balance of the $150,000.00 loan proceeds – approximately $64,000.00 – was diverted to Chesterfield Carwash for "operational purposes" (Tr. 51).

Based on the fact that Dowling never used any of the borrowed funds for the purpose for which he represented they would be used, his intent to deceive is apparent. See In re Pappas, 661 F.2d at 86 ("As [Debtor] never purchased or developed these lots, his intention to deceive [the bank] seems apparent."); Marineau, 1994 U.S. Dist. LEXIS 16600 at 7 ("When money is entrusted to a debtor for a specific purpose, the debtor impliedly represents that it will be used for that purpose, and failure to use the funds for that specific purpose constitutes a misrepresentation of the debtor's intention."); In re Segala, 133 B.R. at 264 ("If funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly. Failure to use the funds would be evidence of a misrepresentation of that intent under § 523(a)(2)(A).").

Dowling's intent to deceive as to the actual intended use of the borrowed funds is further evident from the fact that he immediately began depleting the funds. On the same day that he signed the Note, he immediately used $150,000.00 to pay Dowling Enterprises' pre-existing debt to H&B (Tr. 42-44, 50), and shortly thereafter he diverted $50,000.00 to enrich himself by using those funds to purchase another member's interest in Dowling Enterprises (Tr. 49-50). Consequently, he had

to know that these funds were not being used as represented to Johnson. <u>See</u> <u>Marineau</u>, 1994 U.S. Dist. LEXIS at 9 ("D]ebtor's intent to deceive can be inferred from him immediate depletion of the funds, including $25,000 used on the same day to purchase a Certificate of Deposit to secure overdrafts . . . .").

Dowling ultimately conceded that he needed the money for purposes other than the acquisition of land when he testified, "I used it for business purposes for what was necessary at the time." (Tr. 50). It is clear from the evidence that Dowling knew that he needed these funds for purposes unrelated to a down payment on real estate on the day that he signed the Note.

Dowling's intent to deceive can further be inferred from the fact that he used more than one-half of the borrowed funds for purposes unrelated to Dowling Enterprises. In addition to diverting $50,000.00 to enrich himself, he diverted approximately $64,000.00 to Chesterfield Carwash, a separate business of which Dowling was a member (Tr. 51).

Finally, Dowling's intent to deceive is evident from that fact that the loan from Johnson was not reflected on the Balance Sheet of Dowling Enterprises three weeks after the loan was made, which was prepared by Dowling on February 22, 2008 (Tr. 47-49; Pl's Exh. 7). The funds are not shown as an asset, and the obligation to Johnson are not shown as a liability. (Tr. 48-49; Pl's Exh. 7). This creates a strong inference that the loan proceeds – or most of the proceeds – were never intended for the benefit of Dowling Enterprises.

In short, Dowling misrepresented to Johnson the intended use of the borrowed funds, and his intent to deceive Johnson is evident from (1) the fact that

none of the funds were used as represented, (2) the fact that Dowling immediately depleted the borrowed funds, (3) the fact that Dowling used the borrowed funds to enrich himself and for the operating expenses of Chesterfield Car Wash, and (4) the fact that the loan was not included on Dowling Enterprises' balance sheet.

### (ii) Source of Repayment

A misrepresentations as to the source of funds to be used for repayment of a debt constitutes fraud under § 523(a)(2)(A). See supra Section I(B).

It is undisputed that Dowling represented to Johnson that Dowling Enterprises would be able to repay the loan within 60-days because it had secured a refinance of another property in an amount sufficient to pay Johnson, and that the loan had been approved (Tr. 11, 34). It is further undisputed that, despite Dowling's representations that a loan had been secured, Dowling Enterprises never received such a loan (Tr. 45-47).

The evidence at trial clearly shows that, on the day that Dowling signed the Note, he knew that there was no such loan. In fact, just days prior to signing the Note, Dowling reviewed a draft closing statement from Alpha Omega (Tr. 41-42; Pl's Exh. 6). On that day, it was clear that there was no agreement between Dowling and Alpha Omega as to a loan amount (Tr. 45-46). According to Dowling, the only agreement between him and Alpha Omega was an agreement "to concept." (Tr. 46).

In addition, the draft loan closing statement showed a partial pay off to H&B in the amount of $21,500.00, with a notation that the payoff was "still under negotiation." (Pl's Exh. 6). Five days after reviewing this draft loan closing

statement, Dowling used the funds borrowed from Johnson to make this same

payoff to H&B (Tr. 42-43). Had Dowling truly believed that he was obtaining a loan

from Alpha Omega, with a portion of that loan earmarked to be used to pay off

H&B, it makes absolutely no sense that he would use the funds borrowed from

Johnson to make that same payoff. The only explanation is that as of February 1,

2008, the date on which Dowling signed the Note to Johnson and the date on which

he made the payoff to H&B, he knew that Dowling Enterprises was not receiving a

loan from Alpha Omega. Otherwise, he would have simply awaited the Alpha

Omega loan proceeds to pay off H&B.

B.    *Dowling's Fraudulent Misrepresentations Induced Johnson To Loan Dowling*
      *Enterprises $150,000.00.*

Dowling's representations to Johnson were clearly calculated to induce

Johnson to make the $150,000.00 loan. The representations provided assurance to

Johnson that the loan would be used for a legitimate business purpose – the

purchase of real estate – that would bring value to Dowling Enterprises, and that

the loan would quickly be repaid.

Johnson did, in fact, loan Dowling Enterprises $150,000.00 after these

representations were made to him by Dowling. Johnson testified that but for the

representation made to him by Dowling as to the use of funds and the source of the

funds to repay the loan within 60-days, he would not have loaned Dowling

Enterprises $150,000.00 (Tr. 12-13). According to Johnson, without the

representation as to the funds being used for a down payment on real estate, he

would have viewed the request for a loan as an indication that Dowling had cash

flow problems (Tr. 12). He felt that putting his money into a lot was a secure investment and in keeping with Dowling's vision of building additional car washes (Tr. 12-13).

Without the representation as to the source of funds to repay the loan within 60-days, Johnson would not have made the loan because, as he stated at trial, "I am not a bank. I 'm a friend trying to help a friend for a short period of time." (Tr. 13). Johnson explained that he made it very clear to Dowling that he was not a bank but that he could extend the money for sixty days, and that anything beyond that would cause him a hardship (Tr. 10-11).

Johnson further testified that had Dowling informed him that at least one-third of the money would be used for Dowling's personal benefit rather than the benefit of Dowling Enterprises, he would not have made the loan (Tr. 13-14).

C.   *Johnson Justifiably Relied On Dowling's Fraudulent Misrepresentations.*

Johnson justifiably relied on the misrepresentations made by Dowling. He had been friends with Dowling for eight to ten years (Tr. 9). He knew that Dowling was involved in the car wash business (Tr. 10). Dowling's representations as to the intended use of the funds – to make a down payment on real estate for a new car wash – was consistent with Dowling Enterprises business, which was developing real estate for use as car washes (Tr. 31-32). Real estate was its business (Tr. 32). In fact, Dowling represented that he had a specific location picked out (Tr. 10).

Johnson had no indications that Dowling was misrepresenting the intended use of the funds, or the source of the funds to be used for repayment of the loan.

D.     *Johnson Suffered Harm As A Result of Dowling's Fraudulent*
       *Misrepresentations.*

Johnson suffered harm as the result of Dowling's misrepresentations. Indeed, had Johnson been advised as to the true use of the loan funds, he would not have made the loan (Tr. ). Had he not made the loan, he would not have sustained the loss that Dowling now seeks to discharge. Furthermore, had Dowling used the loan proceeds in the manner set out in his representation to Johnson – to acquire real estate – the real estate would have been available to satisfy the debt owed to Johnson. Instead, the loan proceeds were not used in a manner that created value in Dowling Enterprises.

In addition, had Johnson been advised as to the fact that Dowling Enterprises had not secured financing, he would not have made the loan. (Tr. ). Again, had he not made the loan, he would not have sustained the loss that Dowling now seeks to discharge. Furthermore, had Dowling, in fact, secured the financing as represented to Johnson, Dowling Enterprises could have met its obligation to Johnson, and Johnson would have been paid in full.

<u>CONCLUSION</u>

For the foregoing reasons, the bankruptcy court's September 27, 2012 Judgment should be reversed, and judgment should be entered in favor of Johnson holding and declaring the debt owed by Dowling to Johnson, as reflected in Johnson's state court judgment, non-dischargeable in bankruptcy to the extent of $175,987.50, plus interest at a rate of 18% per annum from November 13, 2009,

plus state court costs in the amount of $228.00, and for such relief as is deemed just and proper.

## REQUEST FOR ORAL ARGUMENT

The Appellant, Robert M. Johnson, requests to make an oral argument. See Notice of Hearing docketed on November 1, 2012.


Respectfully submitted,


/s/ J. Frederick Watson

_____

James Frederick Watson, Esquire
VSB No. 40322
Pavlina B. Dirom, Esquire
VSB No. 66573
CASKIE & FROST, P.C.
2306 Atherholt Road
P. O. Box 6320
Lynchburg, Virginia 24505
(434) 846-2731
(434) 845-1191 (facsimile)
*Counsel for Appellant*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of November, 2012, I electronically filed the Brief of Appellant with the Clerk of the Court using the CM/ECF system and

I have mailed the same to the following: Margaret Valois, Esquire, James River Legal Associates, 725 Church Street, 10th Floor, Lynchburg, Virginia 24504, attorney for Appellee.

<u>     /s/ Pavlina B. Dirom     </u>
Pavlina B. Dirom